**(ORAL ARGUMENT NOT YET SCHEDULED)**

**No. 23-7116**

IN THE

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA

————

CHAZZ CLEVINGER,

*Plaintiff-Appellee,*

v.

ADVOCACY HOLDINGS, INC.
d/b/a ONECLICKPOLITICS,

*Defendant-Appellant.*

RAYMOND ZENKICH; JOHN KOEPKE; RED CHALK GROUP, LLC,

*Defendants-Appellees.*

————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————

**OPENING BRIEF OF APPELLANT**

————

Anand Vijay Ramana
Lyndsey Marie Wajert
VEDDERPRICE, PC
1401 New York Avenue, NW
Suite 500
Washington, DC 20005
(202) 312-3325
aramana@vedderprice.com
lwajert@vedderprice.com

*Counsel for Defendant-Appellant*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ADVOCACY HOLDINGS, INC.
d/b/a OneClickPolitics,

      *Appellant*,

   v.

CHAZZ CLEVINGER, et. al.,

     *Appellees*.

Case No. 23-7116

## APPELLANT ADVOCACY HOLDINGS, INC.'S CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Appellant Advocacy Holdings, Inc. d/b/a OneClickPolitics ("OCP"), by counsel and pursuant to D.C. Circuit Rule 28(a)(1), certifies as follows:

### Parties and Amici

The appellant is Advocacy Holdings, Inc. d/b/a OneClickPolitics. The appellees are Chazz Clevinger; CiviClick, Inc.; and Superior Campaign Solutions, LLC. No intervenors appeared in the district court, and no intervenors have appeared in this appeal. No amici appeared in the district court, and no amici have yet appeared in this appeal.

### Rulings Under Review

The rulings under review are U.S. District Judge Jia M. Cobb's July

i

15, 2023 order and memorandum opinion denying OCP's motion for preliminary injunction, Civil Action No. 23-1176 (JMC) (consolidated under Civil Action No. 23-1159 (JMC), Dkt. No. 52), and August 15, 2023 order and memorandum opinion granting in part and denying in part OCP's motion for reconsideration of the order denying OCP's motion for preliminary injunction, Civil Action No. 23-1176 (JMC) (consolidated under Civil Action No. 23-1159 (JMC), Dkt. No. 66).

<u>Related Cases</u>

Appellant OCP filed the instant action in the United States District Court for the Eastern District of Virginia as Civil Action No. 1:23-cv-419 (CMH/IDD).  The Eastern District of Virginia transferred this case to the United States District Court for the District of Columbia on April 25, 2023.  The D.C. district court designated this case as Civil Action No. 1:23-cv-1176 (JMC).

Appellee Chazz Clevinger previously appealed a ruling in this case to this Court.  This Court assigned that appeal Case Number 23-7089.  Mr. Clevinger voluntarily dismissed that appeal on August 29, 2023.

Other than Civil Action No. 1:23-cv-1159 (JMC), currently consolidated with this case in the district court, OCP is not aware of any

case involving substantially the same parties and the same or similar

issues within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Dated: October 23, 2023                    Respectfully Submitted,

                                           **ADVOCACY HOLDINGS, INC.**
                                           **d/b/a OneClickPolitics**

                                           *By Counsel*

    /s/  *Anand Ramana*
Anand Ramana (DC Bar No. 489478)
VEDDER PRICE, P.C.
1401 New York Avenue, N.W.
Suite 500
Washington, D.C. 20005
Tel: (202) 312-3325
E-mail: aramana@vedderprice.com
*Attorney for Appellant Advocacy*
*Holdings, Inc. d/b/a OneClickPolitics*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of October, 2023, I electronically filed the foregoing pleading through this Court's Court Management/Electronic Court Files system, which then automatically serves it upon the following persons electronically:

> Kenneth E. Chase
> CHASE LAW & ASSOCIATES, P.A.
> 1141 71st Street
> Miami Beach, FL 33141
> 305−402−9800
> Fax: 305−402−2725
> Email: kchase@chaselaw.com

> /s/ *Anand Ramana*
> Anand Ramana (DC Bar No. 489478)
> VEDDER PRICE, P.C.
> 1401 New York Avenue, N.W.
> Suite 500
> Washington, D.C. 20005
> Tel: (202) 312-3325
> E-mail: aramana@vedderprice.com
> *Attorney for Appellant Advocacy*
> *Holdings, Inc. d/b/a OneClickPolitics*

4

iv

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ...........................................i

TABLE OF AUTHORITIES ......................................................vii

GLOSSARY ...................................................................x

INTRODUCTION .............................................................. 1

STATEMENT OF JURISDICTION........................................... 4

STATEMENT OF THE ISSUE................................................. 5

STATEMENT OF THE CASE AND THE FACTS .................................. 6

SUMMARY OF THE ARGUMENT ......................................... 12

STANDARD OF REVIEW................................................... 13

ARGUMENT ................................................................ 14

    I.   OCP Is Likely to Succeed on Its Breach of Noncompete
          Agreement Claim........................................................ 15

          A. The Noncompete Agreement Is Enforceable......................... 17

          B. Clevinger Does Not Dispute That He Breached His
              Noncompete Agreement........................................ 27

          C. Clevinger's Breaches Have Damaged OCP........................... 33

    II.  OCP Is Likely to Suffer Irreparable Harm Absent an
          Order Enforcing the Noncompete Agreement Pending
          the Litigation .............................................................. 37

III. The Balance of the Equities Weighs Heavily In Favor of Prohibiting Clevinger From Violating His Noncompete Agreement. ................................................................. 41

IV. Issuing a Preliminary Injunction Against Clevinger, CiviClick, and SCS Serves the Public's Interest ...................... 42

CONCLUSION ................................................................. 44

REQUEST FOR ORAL ARGUMENT ...................................... 44

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION ................................................................. 46

CERTIFICATE OF SERVICE ............................................... 47

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ........................................................ 15

*ADP, LLC v. Lynch,*
    678 Fed. Appx. 77 (3d Cir. 2017) .................................................... 20

*All Pro Maids, Inc. v. Layton,*
    2004 Del. Ch. LEXIS 116 (Del. Ch. 2004) ...................... 17, 20, 24, 25

*Beacon Assocs., Inc. v. Apprio, Inc.,*
    308 F. Supp. 3d 277 (D.D.C. 2018) .................................................. 35

*BellSouth Telecomms. v. MCImetro Access Transm. Servs.,*
    425 F.3d 964 (11th Cir. 2005) ......................................................... 34

*Computer Aid, Inc. v. MacDowell,*
    2001 Del. Ch. LEXIS 102 (Del. Ch. 2001) ...................................... 24

*COPI of Delaware, Inc. v. Kelly,*
    1996 Del. Ch. 136 (Del. Ch. 1996) .................................................. 20

*Delaware Express Shuttle, Inc. v. Older,*
    2002 Del. Ch. LEXIS 124 (Del. Ch. Oct. 23, 2022) .......................... 21

*Gildor v. Optical Solutions, Inc.,*
    2006 Del. Ch. LEXIS 110 (Del Ch. 2006) ....................................... 38

*IDS Life Ins. Co. v. Sunamerica, Inc.,*
    958 F. Supp. 1258 (N.D. Ill. 1997) ................................................. 42

*James J. Gory Mech. Contr., Inc. v. BPG Residential Partners V, LLC,*
    2011 Del. Ch. LEXIS 200 (Del. Ch. 2011) ...................................... 17

*Kansas City S. v. Grupo TMM. S.A. de C.V.,*
    2003 Del Ch. LEXIS 116 (Del Ch. 2003) ......................................... 38

*Knowles-Zeswitz Music, Inc. v. Cara,*
    260 A.2d 171 (Del. 1969) ................................................................. 23

*Make the Road New York v. Wolf*,
   962 F.3d 612 (D.C. Cir. 2020) ........................................................... 14

*Martin Marietta Materials, Inc. v. Vulcan Materials Co.*,
   68 A.3d 1208 (Del. 2012) ...................................................................... 38

*Morgan Stanley DW Inc. v. Rothe*,
   150 F. Supp. 2d 67 (D.D.C. 2001) ................................................. 34, 42

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
   22 F.3d 546 (4th Cir. 1994) ................................................................. 34

*New York v. Trump*,
   490 F. Supp. 2d 225 (D.D.C. 2020) ..................................................... 15

*Parker v. K&L Gates, LLP*,
   76 A.3d 859 (D.C. 2013) ....................................................................... 16

*Patriot, Inc. v. U.S. Dep't of Housing and Urban Dev't*,
   963 F. Supp. 1 (D.D.C. 1997) ............................................................... 35

*Research & Trading Corp. v. Pfuhl*,
   1992 Del. Ch. LEXIS 234 (Del. Ch. 1992) ......................................... 24

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) ............................................................. 15

*Simplexity, LLC v. Zeinfeld*,
   2013 Del. Ch. LEXIS 95 (Del. Ch. 2013) ........................................... 19

*Smith, Buklin & Assocs. v. Sonntag*,
   83 F.3d 476 (D.C. Cir. 1996) ............................................................... 40

*TGG Mgmt. Co. v. Petraglia*,
   2020 U.S. Dist. LEXIS 6376 (S.D. Cal. 2020) ................................... 35

*Tigani v. Fisher Dev. Co.*,
   2022 Del. Super. LEXIS 139 (Del. Super. 2022) .............................. 17

*Trexler v. Billingsley*,
   2017 Del. LEXIS 254 (Del. 2017) ........................................................ 18

*TriState Courier and Carriage, Inc. v. Berryman,*
   2004 Del. Ch. LEXIS 43 (Del. Ch. 2004) ............................... 20, 21, 24

*True North Commc'ns v. Publicis S.A.,*
   711 A.2d 34 (Del. Ch. 1997) ............................................................. 39

*Trump v. Thompson,*
   20 F.4th 10 (D.C. Cir. 2021) ............................................................. 13

*Univ. of Texas v. Camenisch,*
   451, U.S. 390 (1981) ......................................................................... 15

*VLIW Tech., LLC v. Hewlett-Packard Co.,*
   840 A.2d 606 (Del. 2003) .................................................................. 16

**Statutes**

28 U.S.C. § 1292 ...................................................................................... 5

28 U.S.C. § 1332 ...................................................................................... 4

**Other**

Fed. R. Civ. P. 65 .................................................................................. 15

# GLOSSARY

OCP...............................................OneClickPolitics

SCS ......................... Superior Campaign Solutions

TRO............................temporary restraining order

CEO......................................chief executive officer

## INTRODUCTION

This is an interlocutory appeal of a district court decision denying the portion of a motion for preliminary injunction seeking to enforce a noncompete agreement.

This is not a typical restrictive covenant case where an employee of one company quits to work for an existing competitor. The conduct here is much more egregious. This case is about Appellee/Defendant Chazz Clevinger ("Clevinger"), the highest-level executive of a new and growing company, intentionally planning and executing a scorched-earth attack on his own employer, Appellant/Plaintiff Advocacy Holdings (which does business as OneClickPolitics) ("OCP"), in an obvious attempt to put it out of business while catapulting his own, secretly-established competing businesses, Appellees/Defendants CiviClick, Inc. and Superior Campaign Solutions, LLC ("SCS").

Nothing about Clevinger's plan was legitimate. While still OCP's chief executive officer ("CEO"), he started CiviClick and SCS to subversively divert and create his own customer base from OCP to his own businesses. He lied about losing his computer and secretly contracted for the development competing website only days later, while

1

he was still CEO.  Abusing his power as CEO, he ordered the removal of several important facets of OCP's website to make it seem as if OCP no longer offered certain services.  He fired OCP's entire sales and customer support team just days before resigning.  He intentionally exported OCP's customer list and contact information, and destroyed user data for four employees to hide his tracks.  He manually destroyed a great many OCP files only hours before he resigned on February 1, 2023.

Both before and after his resignation, Clevinger began diverting new business to his new platform through trickery and deception.  He misappropriated OCP's trademark for Google searchers looking for OCP, allowing him to divert to CiviClick searches seeking OCP's website.  His new, nearly identical online platform at CiviClick "went live" on March 1, 2023.

OCP filed the instant lawsuit in March 2023.  The centerpiece of the lawsuit is enforcement of Clevinger's enforceable and specific noncompete agreement that he signed in 2020.  In the district court, OCP moved for a preliminary injunction, seeking, among other things, enforcement the noncompete agreement prohibiting Clevinger and his

2

businesses from competing with OCP, soliciting and contracting with OCP customers, and using the redesigned technology that OCP was set to launch in the spring of 2023.

The district court ultimately granted the preliminary injunction, but only to the extent that it prohibited Clevinger and his companies from using the technology the district court found he stole from OCP. The district court denied the preliminary injunction insofar as it sought to enforce the noncompete agreement because it found that OCP had not established that it was likely to suffer irreparable harm absent injunctive relief.

But OCP *did* establish that it was, and would continue to, suffer irreparable harm *as a matter of law*. It pointed to the provision in the enforceable noncompete agreement where Clevinger openly acknowledged that OCP would suffer such harm if he breached the agreement. OCP also presented other evidence of irreparable harm: (1) the misuse of OCP's stolen and confidential customer information, causing the loss of customer trust and goodwill; (2) the interference with customers and the potential (and, now, actual) loss of those relationships; and (3) the reputational damage caused by Clevinger's derogatory remarks during his admitted solicitation of OCP's clients.

3

Clevinger did not challenge the existence of the provision or the evidence presented. Indeed, the district court even acknowledged the evidence.

In short, OCP established the "irreparable harm" prong (as well as the other three prongs) of the preliminary injunction test. Clevinger's noncompete agreement means nothing unless a court will enforce it before OCP loses a critical mass of its clients to Clevinger and his businesses. OCP is entitled to a preliminary injunction enforcing the noncompete agreement, and this Court should reverse the adverse district court ruling with instructions to prohibit Clevinger and his companies from violating his contract.

## STATEMENT OF JURISDICTION

OCP filed the instant lawsuit in the United States District Court for the Eastern District of Virginia (Alexandria Division) on March 30, 2023. The Virginia federal court assigned it a case number of Civil Action No. 1:23-cv-419. The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive or interest and costs, and is between citizens of different states.

4

On April 25, 2023, the Virginia court transferred the case to the United States District Court for the District of Columbia. The D.C. federal court assigned it a case number of 1:23-cv-1176, and ultimately administratively consolidated it under a pending lawsuit, *Clevinger v. Advocacy Holdings, Inc.*, Civil Action No. 1:23-cv-1159.

OCP filed a motion for preliminary injunction on June 9, 2023. The district court denied the motion *without prejudice* on July 14, 2023. OCP filed an emergency motion for reconsideration of the district court's decision on July 19, 2023. The district court granted in part and denied in part the motion for reconsideration on August 15, 2023.

OCP noticed an interlocutory appeal of the adverse preliminary injunction decision and emergency motion for reconsideration decision on September 11, 2023. This Court has jurisdiction to review these decisions pending the civil action under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

1.    Whether the district court erred when it denied OCP's request for a preliminary injunction prohibiting Appellees Clevinger, CiviClick, and SCS from conducting any competitive business operations in violation of Clevinger's enforceable noncompete

agreement, even though Clevinger conceded conduct that egregiously violates the contract, OCP presented unrebutted evidence of irreparable harm, and Clevinger stipulated in writing to the irreparable harm flowing from his breaches.

## STATEMENT OF THE CASE AND THE FACTS

Appellant OCP is a nationally-known digital advocacy company. For years, it has provided advocacy groups in the United States, Canada, and other countries with the ability to create and execute online campaigns to advocate particular political positions to members of the United States Congress, the federal executive branch, and state and local governments. OCP's primary business model is to secure one- or two-year subscriptions to its online platform. Subscribers have access to essentially four digital advocacy services: (1) digital advocacy and direct messaging services; (2) advocacy acquisition services; (3) legislative bill tracking services; and (4) advisory (*i.e.*, campaign consulting) services.

Appellee Clevinger is the former chief executive officer of OCP. In that capacity since 2017, Clevinger knew every aspect of OCP's business, services, financials, and technology. In his role, he was

intimately familiar with OCP's plans to launch a new version of its online platform. He was instrumental in the design and function of that planned platform in mid- to late-2022.

Given Clevinger's deep role in operating OCP, OCP required Clevinger to sign a "noncompetition, non-solicitation and non-disclosure agreement" on July 15, 2020 ("Noncompete Agreement"). The Noncompete Agreement obligated Clevinger to refrain from competing, or owning a competing company, for one year. On February 1, 2023, Clevinger abruptly resigned his position as CEO without any notice, effective immediately.

Unbeknownst to OCP, Clevinger had been preparing to start his own company to directly compete with OCP in the years leading up to his resignation. He founded Appellee SCS in May 2021. At that time, SCS offered digital advocacy services to the public. In July 2022, Clevinger founded Appellee CiviClick, which would be the primary company to directly compete with OCP.

Within weeks of his resignation, Clevinger began aggressively poaching a number of OCP clients. Most OCP customers believed the CiviClick was OCP's new product, and not a new company, through

7

Clevinger's deceitful solicitation tactics. CiviClick's website and subscription-based platform launched on March 1, 2023. CiviClick's platform was the exact platform designed by OCP in mid-2022, except with CiviClick's branding. In short, Clevinger stole OCP's upgraded platform, and sold it as his own in a concerted effort to steal as many clients from OCP as possible. It was working, and it unfortunately continues to work to date.

On March 30, 2023, OCP filed the instant federal lawsuit against Clevinger in Virginia. At that time, OCP applied for, and secured, an *ex parte* temporary restraining order (generally, "TRO") prohibiting Clevinger from violating his Noncompete Agreement. Clevinger subsequently entered his appearance, and challenged the Court's personal jurisdiction. As a result of that challenge, the Virginia court transferred this case to the United States District Court for the District of Columbia ("district court"). The district court consolidated this case under a retaliatory case that Clevinger had filed against OCP and others just days before the transfer.

OCP again applied for, and received, a total of four additional TROs against Clevinger (May 19, June 2, June 16, and June 30) in the

district court. Under those more narrowly drawn TROs, the district court prohibited Clevinger from, *inter alia*, soliciting OCP's current customers and using its confidential and proprietary information. The district court did not prohibit CiviClick from continuing to solicit new business like the Virginia court had.

OCP filed a motion for preliminary injunction on June 9, 2023. JA 121. By that motion, OCP asked the district court to, among other things, enforce the Noncompete Agreement and prohibit Clevinger, CiviClick, and SCS from competing with OCP. Clevinger opposed the motion. JA 293. The district court held a short evidentiary hearing on July 6, 2023 to accept additional evidence. JA 572. The parties argued the motion virtually on July 7, 2023. JA 792.

The district court entered an order denying the motion for preliminary injunction *without prejudice* on July 14, 2023. JA 978. The following day, the district court docketed its memorandum opinion explaining the reasons for its denial. JA 980. Before providing its rationale, the district court made this telling observation:

> it is worth noting that the Court's ruling is not an endorsement of Clevinger's alleged conduct. The allegations,

9

if true, may well represent stunning breaches of Clevinger's fiduciary and (potentially) contractual obligations.

JA 982.

The district court's memorandum opinion addressed only one of the four preliminary injunction factors: whether OCP was likely to suffer irreparable harm absent a preliminary injunction.[1]  In short, the district court found that, "[w]hile the question is certainly a close one, the Court finds that Advocacy Holdings has not established a likelihood that it will suffer irreparable harm in the absence of an injunction."  JA 981.  More specifically, the district court held that (1) loss of business is an economic, and therefore not irreparable, harm because any future losses are calculable and OCP will remain in business; (2) OCP did not show that Clevinger's use of confidential and proprietary information caused the loss of trust or goodwill; and (3) OCP did not show reputational damage.  JA 988-95.

---

[1]    The district court noted that it remains uncertain in this Circuit whether all four factors should be weighed on a sliding scale (*i.e.*, whether significant evidence of one factor would permit entry of a preliminary injunction even though another factor had only some evidence), or whether each of the four must be established with a "clear showing" of evidence.  JA 986 n.2.

10

OCP filed a comprehensive motion for reconsideration four days later and asked the district court to "reverse its Memorandum Opinion, and enter OCP's requested preliminary injunction to stop Clevinger's "stunning" breaches of his Noncompete Agreement and common law duties to OCP." JA 996. OCP advanced two primary grounds for its motion. ***First***, OCP argued that Clevinger's written stipulation that any breach of the Noncompete Agreement would constitute irreparable harm established that prong of the test.[2] ***Second***, OCP asked the district court to reconsider its showings of customer tampering and interference, theft of OCP customer information and platform design, and Clevinger's disparagement.

The district court held a hearing on OCP's motion for reconsideration on August 10, 2023. JA 1121. Five days later, the district court entered and order granting the motion in part and denying it in part. JA 1177. The district court granted the motion and enjoined Clevinger, CiviClick, and SCS "from using Advocacy Holdings' platform design and interface for any purpose, including on any website, platform, or interface." JA 1177, 1183. It denied the motion

---

[2]     The district court noted Clevinger's express acknowledgement in its opinion denying the motion for preliminary injunction. JA 991 n.6.

"in all other respects," including OCP's request to revisit the breach of the Noncompete Agreement. In its opinion, the district court did not address OCP's argument that the district court should revisit its decision to decline enforcement of the Noncompete Agreement. JA 1177-82.

OCP timely noticed the instant interlocutory appeal on September 11, 2023. JA 1185.

Since the district court's August 15, 2023 order, Clevinger and CiviClick have cosmetically modified the subscriber platform interface in order to circumvent the district court's prohibition on using OCP's specific platform design. As such, Clevinger and CiviClick are now fully competing directly against Clevinger's former employer, OCP, in direct violation of the Noncompete Agreement. To date, Clevinger has not been held accountable for his brazen violations of his Noncompete Agreement, and OCP continues to lose customers to CiviClick.

## SUMMARY OF THE ARGUMENT

The district court erred when it declined to enforce Clevinger's Noncompete Agreement pending the outcome of the instant litigation. In reaching its decision, the district court analyzed only one of four

12

preliminary injunction factors: whether OCP established that it was likely to suffer irreparable harm if the district court did not enforce the Noncompete Agreement during the proceedings. It committed a legal error in its analysis because it failed to properly treat Clevinger's written stipulation in the Noncompete Agreement that he acknowledged irreparable harm if he breached the contract, and because it concluded that the three proffered types of irreparable harm were insufficient to satisfy that prong of the test as a matter of law.

Properly analyzed, the district court should have found, based on the unrebutted evidence OCP proffered, that OCP established all four preliminary injunction factors. OCP is therefore entitled to a preliminary injunction prohibiting Clevinger and his companies from competing with OCP, including, but not limited to, barring any solicitation or contracting with OCP clients. This Court should reverse the district court's decision and remand this case with orders to the district court to enforce Clevinger's Noncompete Agreement.

## STANDARD OF REVIEW

This Court reviews a district court's denial of a preliminary injunction for an abuse of discretion. *Trump v. Thompson*, 20 F.4th 10,

13

23 (D.C. Cir. 2021). In so doing, this Court reviews the district court's underlying legal conclusions de novo, and the district court's factual findings are reviewed for clear error. *Make the Road New York v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020).

The specific issues presented in this appeal should be reviewed de novo. OCP does not challenge any of the district court's factual findings. Rather, OCP asks this Court to review whether the undisputed facts adduced during the preliminary injunction proceedings which were acknowledged by the district court established all four elements of the preliminary injunction test as a matter of law.

## ARGUMENT

The district court erred when it denied OCP's initial and renewed requests for a preliminary injunction prohibiting Clevinger and his companies from competing with OCP in violation of Clevinger's Noncompete Agreement. JA 980-95, 1177-82. For the following reasons, this Court should reverse the district court's decision to deny the requests, and remand the case with instructions to the district court to enter the requested preliminary injunction enforcing the Noncompete Agreement.

14

Rule 65(a) of the Federal Rules of Civil Procedure authorizes a district court to issue a preliminary injunction. FED. R. CIV. P. 65(a). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *New York v. Trump*, 490 F. Supp. 2d 225, 235 (D.D.C. 2020) (citing *Univ. of Texas v. Camenisch*, 451, U.S. 390, 395 (1981)). "A plaintiff seeking a preliminary injunction must establish (1) that [it is] likely to succeed on the merits, (2) that [it is] likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in [its] favor, and (4) that an injunction is in the public interest." *Id.* (citing *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).

On its motion for a preliminary injunction, OCP established all four prongs of this preliminary injunction test. For the reasons that follow, the district court should have enforced the Noncompete Agreement pending the instant litigation.

I.   <u>OCP Is Likely to Succeed on Its Breach of Noncompete Agreement Claim.</u>

OCP alleges that Clevinger breached his Noncompete Agreement in Count I of the amended complaint. JA 48-50. Clevinger's

15

Noncompete Agreement flatly prohibits him from establishing or operating a competing business, including soliciting and contracting with OCP customers, for 12 months after termination. JA 71-76. Clevinger does not dispute that he engaged in these competitive activities both before and after he resigned on February 1, 2023. Even so, the district court did not directly address whether OCP was likely to prevail on its breach of Noncompete Agreement claim. JA 980-95, 1177-82. OCP, however, established that it is very likely to do so.

To prevail on a claim for breach of contract under Delaware law,[3] a plaintiff must establish evidence that: (1) a contract existed between the parties; (2) the defendant breached his obligation imposed by the contract; and (3) the plaintiff suffered damages as a result of the defendant's breach. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). OCP presented unrebutted, conclusive evidence establishing all three elements.

---

[3] Under the District of Columbia's approach to conflict-of-laws, "the forum state's choice-of-law rules apply to choice-of-law questions, unless the contract explicitly provides otherwise." *Parker v. K&L Gates, LLP*, 76 A.3d 859, 869 (D.C. 2013). The Noncompete Agreement is "governed by and construed in accordance with the substantive laws of the State of Delaware without giving effect to Delaware conflicts of laws principles." JA 186.

A.    <u>The Noncompete Agreement Is Enforceable.</u>

The district court never opined on the enforceability of the Noncompete Agreement.    JA 980-95, 1177-82.    The Noncompete Agreement, however, is an enforceable contract.

Under Delaware law, a noncompete provision must "(1) meet general contract law requirements, (2) be reasonable in scope and duration, both geographically and temporally, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities." *All Pro Maids, Inc. v. Layton*, 2004 Del. Ch. LEXIS 116, at *16 (Del. Ch. 2004). Here, OCP put on substantial evidence during the preliminary injunction hearing that Clevinger's Noncompete Agreement satisfies all of these elements.

***First***, the Noncompete Agreement meets general contract law requirements.  "It is the blackest of black-letter law that an enforceable contract requires an offer, acceptance, and consideration."  *James J. Gory Mech. Contr., Inc. v. BPG Residential Partners V, LLC*, 2011 Del. Ch. LEXIS 200, at *6 (Del. Ch. 2011).  These elements attach when the parties (1) intend to be bound; (2) agree to sufficiently definite terms; and (3) make a bargained-for exchange."  *Tigani v. Fisher Dev. Co.*,

17

2022 Del. Super. LEXIS 139, at *4-5 (Del. Super. 2022) (citation omitted). "To determine whether a contract was formed, the court must examine the parties' objective manifestation of assent, not their subjective understanding." *Trexler v. Billingsley*, 2017 Del. LEXIS 254, at *7-8 (Del. 2017).

OCP presented unrebutted evidence that it drafted and offered the Noncompete Agreement to Clevinger in 2020. JA 170, 324. Clevinger manifested his acceptance of OCP's offer by signing the Noncompete Agreement on July 15, 2020. JA 187, 325. The Noncompete Agreement clearly states that OCP "requires [Clevinger] to enter into this Agreement as a condition of entering into and continuing" his at-will employment with OCP. JA 182. It also indicates that the contract exists "in order to protect [OCP's] legitimate business interests and for good and valuable consideration." JA 182. In short, OCP offered Clevinger the Noncompete Agreement in exchange for his continued at-will employment, and Clevinger accepted the Noncompete Agreement terms in order to continue his employment with OCP. It is undisputed that the parties intended to be bound by this contract.

The Noncompete Agreement contains binding language commonly found in similar restrictive agreements with high-level executives of

18

companies.  See, generally, JA 182-86.  Most important, however, are the very specific prohibitions relevant to this action:

- Paragraph 2, which prohibits Clevinger from misappropriating, disclosing, or using any OCP confidential information (clearly defined) "for [Clevinger's] benefit or on behalf of any third party;

- Paragraph 4, which bans Clevinger's ownership or operation of any competing business in the United States (like CiviClick or SCS, to the extent it is competing with OCP);

- Paragraph 5, which forbids Clevinger from soliciting ***or contracting with*** any OCP customer or vender for services that compete with the services offered by OCP; and

JA 183-84.  The Noncompete Agreement satisfies the general contract requirements of offer, acceptance, and consideration, and its terms are sufficiently definite.

***Second***, the temporal and geographic restrictions in the Noncompete Agreement are both eminently reasonable.  To begin with, the Noncompete Agreement's 12-month ban on competitive and solicitation activities is reasonable as a matter of law.  Delaware courts have granted preliminary injunctions against former CEOs who breach their one-year noncompetition agreements.  See, e.g., *Simplexity, LLC v. Zeinfeld*, 2013 Del. Ch. LEXIS 95 (Del. Ch. 2013) (upholding CEO's

19

noncompetition provisions under harsher Virginia law). Indeed, Delaware courts have found that covenants not to compete up to two years are reasonable and enforceable. *See, e.g., All Pro Maids*, 2004 Del. Ch. LEXIS 116, at *17 (upholding noncompete agreement for two or fewer years), *TriState Courier and Carriage, Inc. v. Berryman*, 2004 Del. Ch. LEXIS 43, at *43 (Del. Ch. 2004) (upholding two year period); *COPI of Delaware, Inc. v. Kelly*, 1996 Del. Ch. 136, at *12 (Del. Ch. 1996) (two year restriction reasonable for company officers); see *ADP, LLC v. Lynch*, 678 Fed. Appx. 77, 80 (3d Cir. 2017) (affirming preliminary injunction based on 12-month noncompetition and nonsolicitation provisions).

Here, twelve months is a reasonable time to prohibit Clevinger's competitive activities because Clevinger was OCP's CEO and had access and knowledge of every aspect of OCP's current business and future plans. JA 171. As recent at January 17, 2023, OCP's founders and Clevinger held a meeting specifically to discuss these plans for the following two years. JA 171. Those plans included, but were not limited to, OCP's rollout of its new web-based platform in during the summer or fall of 2023. JA 171. OCP proved on the preliminary

20

injunction motion (and the district court ultimately found on the motion for reconsideration), that Clevinger stole that web-based platform and employed it on the CiviClick website when it launched on March 1, 2023.[4]   JA 1180 ("It is now apparent that Clevinger copied Advocacy Holdings' redesign plans for his own use, and that Clevinger only had access to those plans because he was CEO of Advocacy Holdings."). Moreover, one year of noncompetition naturally guards against Clevinger's false representations to OCP's customers that OCP was going out of business.  OCP's customers would know that to be false if OCP was able to service its customers for a full year after Clevinger's departure.

The Noncompete Agreement's geographic limitations are also reasonable.  Delaware courts have found that covenants not to compete restricted to "the geographic region" in which the company conducts business is reasonable.  *TriState Courier*, 2004 Del. Ch. LEXIS 43, at *6, 43 (upholding restriction "within geographic region" in which company conducts business); *Delaware Express Shuttle, Inc. v. Older*, 2002 Del. Ch. LEXIS 124, *51-52 (Del. Ch. Oct. 23, 2022) (upholding

---

[4]    The documents and things produced in response to the subpoena to Design in DC should illuminate this point more.

restriction against competition within where almost all of plaintiff's customers are located).

The Noncompete Agreement prohibits Clevinger from establishing or operating a competing business in the United States. JA 184. It prohibits him from soliciting customers or venders, or hiring employees, for the purpose of engaging "in Competitive Business Activity," which is defined to cover the United States. JA 182.

OCP's business has a national reach because it provides digital advocacy to the United States Congress. JA 173. OCP's customers include non-profit organizations, associations, companies, and agencies across the United States. JA 173. During the preliminary injunction hearing, OCP put on unrebutted evidence that from 2020 (the year Clevinger signed the Noncompete Agreement) to the hearing date, OCP engaged 431 customers *in 43 states*. JA 173. It also secured 32 customers in Australia, Canada, and the United Kingdom. JA 173. OCP had 138 paying customers for the last half of 2020, 246 in 2021, and 186 in 2022. JA 173. It only has 57 paying customers through May 31, 2023. JA 173. Thus, the geographic scope is drawn to protect OCP's legitimate business interests in the United States.

Perhaps most notably, however, is that Clevinger expressly acknowledged the reasonableness of the Noncompete Agreement's restrictions. Paragraph 9 reads:

> 9.  <u>Reasonableness of Restrictions</u>. [Clevinger] stipulates that the restrictions and obligations in this Agreement are reasonable (including the time periods, geographic scope and activity limitations) and necessary for the protection of [OCP's] legitimate business interests, do not prohibit [Clevinger] from using general skills and know-how acquired during or prior to employment with [OCP] and do not preclude [Clevinger] from earning a livelihood, working in his or her chosen field or otherwise impose any undue hardship. [Clevinger] further stipulates that the geographic scope is necessary given that [OCP] conducts business throughout the United States in a specialized industry, regardless of whether it maintains a physical office in a particular location.

JA 185. Clevinger's acknowledgement – mandatory in order to keep his job as CEO in July 2020 – could not be more clear. He conceded that the restrictions in the Noncompete Agreement are reasonable in order to remain CEO.

**Third**, enforcing the Noncompete Agreement clearly advances OCP's legitimate economic interests. "[R]easonable protection for an owner of a decentralized business is necessary because the former employee has had an opportunity to develop economically valuable relationships with his former employer's customers." *Knowles-Zeswitz*

23

*Music, Inc. v. Cara*, 260 A.2d 171, 175 (Del. 1969). "In determining whether or to what extent the employer has a legitimate interest in restricting an employee's future employment, the Court must consider the specific relationship between the client and the employee." *Computer Aid, Inc. v. MacDowell*, 2001 Del. Ch. LEXIS 102, at *6 (Del. Ch. 2001). "Where an employee receives specialized training or learns trade secrets, a restrictive covenant may be used to protect the legitimate interests of the employer." *Id*.

Clevinger was OCP's highest officer for over five years. JA 173. Clevinger's experience as OCP's CEO armed him with the ability to damage OCP's legitimate business interests – which he has most certainly done in the past year. JA 173. "Interests which the law has recognized as legitimate include protection of employer goodwill and protection of employer confidential information from misuse." *Research & Trading Corp. v. Pfuhl*, 1992 Del. Ch. LEXIS 234, at *32-33 (Del. Ch. 1992); see also *See TriState Courier*, 2004 Del. Ch. LEXIS 43, at *42-43 (holding employer had a legitimate interest in preventing employee's contacts, developed as an employee of employer, from being used in competition against it); *All Pro Maids*, 2004 Del. Ch. LEXIS 116, at *18

24

("An employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs."). "Courts have long recognized that an employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs." *Id.*

OCP has an obvious economic interest to protect is its business from being stolen by a hostile former CEO. JA 173. As CEO, Clevinger had unfettered access to every facet of the business: financials, confidential business plans and strategies, the current and future technologies employed in digital advocacy, and, perhaps most importantly, OCP's customer relationships. JA 173, 333, 335. This confidential knowledge must be protected. Of all employees, Clevinger as CEO could cause the most competitive damage to OCP if he is allowed to immediately interfere and compete with the business he ran for almost its entire existence. JA 173.

Moreover, OCP's goodwill must be protected. Clevinger has been clearly trading on OCP's goodwill. JA 174. He was even so bold as to

25

use OCP's registered trademark in CiviClick's Google-sponsored ad to advertise the CiviClick platform.  JA 174.  Revenues, OCP confidential information, goodwill, and customer relationships are all protectable interests.

*Fourth*, the balance of the equities favors enforcement of the Noncompete Agreement.   OCP required Clevinger to sign the Noncompete Agreement in order to maintain his position as CEO from 2020 through his abrupt resignation in February 2023.  JA 171.  The Noncompete Agreement serves to protect OCP's confidential business information (*e.g.*, financial, methodologies, technologies, strategic plans, etc.) and business relationships with its clients, which now have become vulnerable due to Clevinger's breach of the Noncompete Agreement.  JA 182.  Failing to enforce the Noncompete Agreement would deprive OCP of the benefit of its bargain (protecting its legitimate business interests) while permitting Clevinger to escape consequences for his clear breach of his contractual obligations by directly threatening OCP's legitimate business interests.  Enforcement of the Noncompete Agreement would preclude Clevinger from competing with OCP at all and soliciting OCP's clients for a reasonable amount of time.  The balance of equities falls in OCP's favor.

26

\*    \*    \*

In sum, OCP established during the preliminary injunction proceedings that the parties properly formed the Noncompete Agreement, the restrictions are reasonable and narrowly tailored to protect OCP's legitimate business interests, and the balance of the equities favors enforcing the contract that Clevinger needed to sign to remain as OCP's CEO with access to the entire company's confidential materials and strategic plans. The Noncompete Agreement is enforceable.

B.    <u>Clevinger Does Not Dispute That He Breached His Noncompete Agreement.</u>

The district court did not specifically analyze whether Clevinger's conduct breached his Noncompete Agreement.[5]    Even so, OCP presented unrebutted evidence during the preliminary injunction proceedings that Clevinger in fact severely and significantly breached (and is continuing to breach) all of the clauses of his Noncompete Agreement that prohibit him from (1) starting or operating a competing business in the United States; and (2) diverting any customer or vendor

---

[5]    It did, however, characterize Clevinger's conduct as "stunning breaches of … fiduciary and (potentially) contractual obligations." Dkt. No. 25 at 3.

27

in the United States with whom OCP has done business in the last 12 months.

*First*, Clevinger, ***while employed at OCP***, admittedly started *two* businesses: CiviClick and SCS. Clevinger founded CiviClick in Delaware on July 21, 2022 – while he was still CEO of OCP. JA 35, 175. According to CiviClick's website, www.civiclick.com, "CiviClick is reliable and modern grassroots advocacy software at its finest." JA 175, 175, 197. It further boasts:

> With so many legacy vendors to choose from, CiviClick exists to bring digital advocacy, public affairs, and government relations professionals innovative technology solutions that are as forward-thinking as they are easy-to-use.

JA 175, 197. CiviClick offers four services: (1) CiviClick, which is its web-based digital advocacy software package; (2) CiviBoost, which is its advocacy advertisement service; (3) CiviManage, which is its campaign advisory service; and (4) CiviRefer, which is its advocacy acquisition service. JA 175, 197-210. CiviClick launched its competing website, including its web-based software application also named "CiviClick," on March 1, 2023. JA 36.

Clevinger readily concedes that CiviClick provides the same or similar services as OCP, making it a direct competitor of OCP. JA 175,

586-91. OCP offers four services: (1) a web-based digital advocacy software package; (2) advocate acquisition services; (3) bill tracking services; and (4) campaign advisory services.  JA 21-24.  As the district court ultimately found, CiviClick's web-based software package is substantially the same as OCP's software package.   JA 175, 1180. CiviClick's campaign advisory and advocate acquisition services are the same as well.  JA 175.  CiviClick knows it is a competitor because it uses OCP's trademark in the CiviClick Google sponsored ad business name without the permission of OCP.

Moreover, before he founded CiviClick, Clevinger founded SCS on May 11, 2021, but he only registered it to do business in the District of Columbia in March 2023 – the same month the CiviClick platform "went live."   JA 175, 341.   According to SCS' website, www.superiorcampaign.com, SCS claims it provides two types of "legal marketing services."  JA 175-76.  First, it helps "law firms quickly acquire new mass torts clients."  JA 176, 215.  Second, it provides "digital advertising," which "help[s] you get the right message in front of the most impactful audience through programmatic, display, social media, OTT, Co-Registration, and/or our proprietary database of consumers."  JA 176, 216.

29

More recently, SCS began doing business as CiviClick. JA 177, 346. On May 22, 2023, one of OCP's old customers – Iron Light – accidentally forwarded a CiviClick invoice to Clevinger's old OCP email address. JA 177, 220, 346. The invoice requested Iron Light to pay "Superior Campaign Solutions (DBA CiviClick)" for CiviClick's "annual grassroots advocacy software subscription." JA 220, 346. The payment instructions request payment to SCS' Bank of America account. JA 220.

In sum, Clevinger established CiviClick as a direct competitor to OCP. He established SCS, which now it functions as CiviClick's alter ego because it "does business as" CiviClick. Both CiviClick and SCS – both under the operation of their founder and CEO, Clevinger – work together in tandem to compete with OCP. This is a direct, clear, and inexcusable violation of Paragraph 4 of the Noncompete Agreement, which provides that Clevinger

> will not …(a) fund, own, invest in, set up or start a Competing Business located in the United States; or (b) become employed by, work for or otherwise provide services to or on behalf of a Competing Business, in the United States, to the extend such employment, work or services involves executive, management or sales responsibilities or duties.

JA 184.

**Second**, Clevinger openly concedes that he has solicited and contracted with OCP's clients into moving their digital advocacy business to CiviClick.  As a general matter, Clevinger's LinkedIn profile advertises that he

> Launched a new and exciting public affairs technology venture as the Founder and CEO of CiviClick.  … Please reach out to me at chazz@civiclick.com if you think we can be helpful and/or visit our website for more information: https://civiclick.com.

JA 177, 225.  CiviClick's website advertises its services globally.  JA 177, 347.

Clevinger's direct solicitation of customers for CiviClick has been nothing short of deceptive in many instances.[6]  Prior to filing its amended complaint, OCP uncovered eight (8) examples of Clevinger soliciting OCP customers to subscribe to CiviClick's software application and digital advocacy services between February 6, 2023 (five days after he resigned from OCP) and May 29, 2023.  JA 177-79.  In these examples, Clevinger directly poached the following OCP customers:  Yamaha Motor Company, Firearms Policy Coalition,

---

[6]     If Clevinger or CiviClick solicited or provided **any** services to **any** former OCP customer between March 31 to April 24, 2023, or from May 19 to the July 14, 2023, they violated the TROs entered in this case.

National Hookah Community Association, FreedomWorks, JVA Campaigns, Waterways Council, Prosperous America, and American Conservative Union (through its communications director at Lagniappe Communications). JA 177-79.

The district court permitted limited discovery prior to the preliminary injunction hearing precisely to, at least generally, gauge the scope of Clevinger's contracting with OCP customers. During the preliminary injunction hearing, Clevinger openly conceded that he had invoiced up to 12 OCP clients.[7]  JA 621-22.

Clevinger's solicitation of and provision of services to OCP's current customers is an obvious and blatant breach of Paragraph 5 of the Noncompete Agreement, which states that Clevinger

> will not …(a) solicit, call upon or contact any Restricted Customer or Restricted Vendor for the purpose of engaging in Competitive Business Activity; (b) contract with, sell to or perform services for or on behalf of a Restricted Customer or Restricted Vendor in connection with Competitive Business Activity; or (c) divert, interfere with, or attempt to divert or

---

[7]    CiviClick produced 50 invoices to OCP prior to the preliminary injunction hearing.  Contrary to Clevinger's testimony under oath, the invoices reflected a total of 26 customers, 18 of which were current or former OCP customers.  JA 824-26.  That means that as of July 7, 2023, about 70% of CiviClick's customer base was comprised of OCP customers he pried away from OCP.  Another four of the CiviClick clients are relationships cultivated by Clevinger while at OCP.  JA 826.

interfere with, [OCP's] business relationship with any Restricted Customer or Restricted Vendor.

JA 184. Clevinger therefore concedes that he repeatedly breached Paragraph 5 of the Noncompete Agreement in a very short period of time.

In sum, OCP presented unrebutted evidence that Clevinger, CiviClick, and SCS breached Paragraphs 4 (non-competition) and 5 (non-solicitation/no-service of customers) of the Noncompete Agreement.

### C.    Clevinger's Breaches Have Damaged OCP.

There is simply no doubt that OCP has suffered damages as a direct and proximate result of Clevinger's breach of the Noncompete Agreement. Of course, OCP has already suffered monetary loss caused by Clevinger's diversion of current OCP customers to his CiviClick business. Those monetary damages equal the total amount of lost subscriptions. Those lost subscriptions will be calculated and reduced to a damages award at trial. For the purposes of demonstrating a likelihood of success on the merits at trial, demonstrating damages flowing from the breach is all that is necessary.

Even so, the greater loss is the irreparable harm Clevinger continues to cause if CiviClick (and SCS) are permitted to continue

their breaches of the Noncompete Agreement. This irreparable harm is threefold.

*First*, OCP is damaged by Clevinger's and CiviClick's misuse of OCP's confidential and or proprietary information, and the concomitant loss of customer trust and goodwill. See *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001) (loss of confidential information and goodwill constitutes irreparable harm). Clevinger stole over 5,400 contacts and used them by blasting CiviClick advertisements to them in order to divert their business from OCP to CiviClick. JA 180, 609.

*Second*, OCP will suffer incalculable damages because of the loss of customers. *Rothe*, 150 F. Supp. 2d at 77 (stealing customers causing incalculable damages constitutes irreparable harm); *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied."); *BellSouth Telecomms. v. MCImetro Access Transm. Servs.*, 425 F.3d 964, 970 (11th Cir. 2005) (significant loss of customers and goodwill

34

qualifies as an irreparable injury); *TGG Mgmt. Co. v. Petraglia*, 2020 U.S. Dist. LEXIS 6376, at *22 (S.D. Cal. 2020) ("loss of customers to a competitor is considered to be irreparable harm that justifies equitable relief.")

As of July 7, 2023, OCP knew that it has already lost at least 18 customers to CiviClick, and many more customers have yet to renew their 2024 subscriptions.[8]  JA 180, 621-22.  The loss of those customers, however, is not just for this year.  JA 180.  It is for other advocacy services, many of which are more lucrative, and for a period of time in the future that is unknowable.  JA 180.  Simply stated, there is no way to even generally calculate the loss of future revenues from stolen customers.  JA 180.

**Third**, Clevinger's misrepresentations to OCP's customers have damaged OCP's reputation in the marketplace.  See *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) ("black mark" on reputation that can lead to lost business is irreparable harm); see also *Patriot, Inc. v. U.S. Dep't of Housing and Urban Dev't*, 963 F. Supp. 1, 5 (D.D.C. 1997).  Clevinger's disinformation campaign against OCP has

---

[8]    OCP has lost many more customers since July 7, 2023.

already bruised OCP's reputation.  JA 180.  Customers have informed OCP that they thought it was "closing," that there are "major changes underway," and that OCP was "transitioning to another platform."  JA 180.  Clevinger's representations clearly present a false image that OCP is at best unstable, and at worst, going out of business.  JA 180.

A preliminary injunction enforcing the Noncompete Agreement and shutting down Clevinger's businesses would immediately restore OCP's reputation to where it was before Clevinger disparaged it to OCP's customers.  Those same customers would migrate back to OCP out of necessity and learn that OCP was performing better than ever. JA 180.  It would mitigate the reputational harm caused by Clevinger to date.  JA 180.

In short, Clevinger's violations of his Noncompete Agreement has and continues to cause OCP irreparable harm.  This Court should not allow Clevinger or his companies to continue to inflict this irreparable harm onto OCP until it is forced to shut its operations down.

\*    \*    \*

While the district court did not analyze OCP's likelihood of success on the merits of Count I (breach of Noncompete Agreement), it is clear

from the evidence produced during the preliminary injunction proceedings that OCP has done so. The Noncompete Agreement is enforceable, Clevinger conceded under oath to conduct that indisputably violates Paragraphs 4 and 5 of the Noncompete Agreement, and OCP has been both monetarily and irreparably damaged by Clevinger's shameless conduct. OCP has established the first prong of the preliminary injunction test.

II.    <u>OCP Is Likely to Suffer Irreparable Harm Absent an Order Enforcing the Noncompete Agreement Pending the Litigation</u>

The district court openly acknowledged that "the question [of irreparable harm] is certainly a close one." JA 981. Even so, it found that OCP "has not established a likelihood that it will suffer irreparable harm in the absence of an injunction." JA 981-82. The district court erred as a matter of law because Clevinger stipulated to the irreparable nature of the harm that he would cause if he breached the Noncompete Agreement.

As explained above, the Noncompete Agreement is an enforceable contract. See supra, Section I.A. Paragraph 11 of the Noncompete Agreement provides:

37

11. <u>Injunctive Relief</u>.     [Clevinger] acknowledges that irreparable harm will result to [OCP] if he or she violates any of the restrictions or obligations set forth herein and that, under such circumstances, [OCP] will have no adequate remedy at law.     Therefore, in the event of any actual, anticipated or threatened breach of such restrictions or obligations, [OCP] will be entitled to specific performance and the immediate entry of injunctive relief without imposition of bond or other security.   Such relief is in addition to all other remedies available to [OCP] by contract, at law or in equity.

JA 185.  Clevinger's contractual stipulation, coupled with the proffered evidence on irreparable harm, dispositively proves the irreparable harm prong in this case under applicable law.

Under Delaware law,[9] "courts have long held that contractual stipulations as to irreparable harm alone suffice to establish that element for the purpose of issuing . . . injunctive relief." *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1226 (Del. 2012); see also *Gildor v. Optical Solutions, Inc.*, 2006 Del. Ch. LEXIS 110, at *39-40 (Del Ch. 2006) ("As long as the parties did not include the irreparable harm stipulation as a sham … then the stipulation will be upheld); *Kansas City S. v. Grupo TMM. S.A. de C.V.*, 2003 Del. Ch. LEXIS 116, at *20-21 (Del Ch. 2003) (contractual

---

[9]     Paragraph 17 of the Noncompete Agreement provides that Delaware law governs the contract.  JA 186.

stipulation establishes element of irreparable harm unless "the facts plainly do not warrant a finding of irreparable harm"); *True North Commc'ns v. Publicis S.A.*, 711 A.2d 34, 44 (Del. Ch. 1997) ("The irreparable harm element of the injunction standard is established by [defendant's] own contractual stipulation . . . . Defendants cannot now say there is no irreparable harm.").

Accordingly, Clevinger's stipulation to the injunctive relief sought (*i.e.*, enforcement of Paragraphs 4 and 5 of the Noncompete Agreement) ***is binding unless there is no evidence*** that OCP will suffer irreparable harm.

The district court, for its part, acknowledged this written stipulation in its initial opinion denying the preliminary injunction motion.    JA 991 n.6.    It downplayed its significance, however, by concluding that "that sort of provision alone is 'an insufficient prop' to support a preliminary injunction." [10]    JA 991 n.6.    The district court's minimization of the significance of Clevinger's stipulation is misguided for two reasons.

---

[10]    The district court did not address OCP's motion for reconsideration insofar as OCP challenged the conclusion that the written stipulation was insufficient evidence.    JA 1177-82.

***First***, the case upon which the district court relied does not simply state that such a written stipulation to preliminary injunctive relief is "an insufficient prop." See *Smith, Buklin & Assocs. v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996) (citing D.C. law). Rather, in that case, this Court stated that such a provision "***by itself*** is an insufficient prop." *Id*. (emphasis added). In *Sonntag*, the moving party did not describe with any specificity what the irreparable harm was other than one previously-lost customer, and openly conceded that a preliminary injunction would not benefit it. *Id*. Thus, the plaintiff in that case relied ***solely*** on the contractual provision to prove irreparable harm. That is not the case here. OCP has specifically identified and presented evidence of three separate kinds of irreparable harm. See supra, at Section I.C.

***Second***, and perhaps more importantly, the district court's reasoning rests on inapplicable law. In dismissing Clevinger's stipulation, it improperly relied on District of Columbia law, and not Delaware law. As noted above, the Noncompete Agreement is governed by and construed in accordance with Delaware law. JA 186. Delaware law's construction of Clevinger's stipulation is notably more relaxed

40

than under D.C. law. Under Delaware law, the stipulation alone is sufficient; under D.C. law the stipulation plus some evidence of irreparable harm is required. In this case, this error is a distinction without much of a difference: OCP satisfies the irreparable harm prong of the test because Clevinger agreed to this stipulation **and** OCP has presented evidence of three independent forms of irreparable harm in this case.

The district court erred when it concluded that OCP failed to establish the likelihood of irreparable harm to support a preliminary injunction enforcing the Noncompete Agreement.

III. <u>The Balance of the Equities Weighs Heavily In Favor of Prohibiting Clevinger From Violating His Noncompete Agreement</u>.

The district court never analyzed the balance of the equities for Count I. JA 980-95, 1177-82. Here, OCP established that the balance of the relative equities weighs substantially in favor of issuing preliminary injunctive relief to prevent Clevinger and his companies from driving OCP out of business.

Without injunctive relief, OCP will continue to be harmed by Clevinger's continued unlawful conduct. The injunction, on the other

41

hand, will only require Clevinger to cease his egregious breaches of contractual and fiduciary obligations to OCP, which does not present any likelihood of ***illegitimate*** harm to Clevinger. *See Rothe*, 150 F. Supp. at 78-79 (holding that the balance of the equities favors the plaintiff when the defendant, a former employee of plaintiff, was soliciting the plaintiff's clients in breach of his non-solicitation agreement.) Accordingly, the balance of the equities favors prohibiting unlawful conduct, and protecting the righteous.

IV.   <u>Issuing a Preliminary Injunction Against Clevinger, CiviClick, and SCS Serves the Public's Interest</u>

The district court did not analyze whether prohibiting Clevinger and his companies from violating Clevinger's Noncompete Agreement served the public interest.  JA 980-95, 1177-82.  There is a strong public interest in enforcing Clevinger's contract with OCP, (temporarily) banning CiviClick and SCS from doing any digital advocacy business, and forbidding the defendants from using stolen OCP customer data.

Preliminary injunctive relief serves the public's interest in enforcing reasonable contracts. *See Rothe*, 150 F. Supp. 2d at 79. Further, "the public has no interest in destroying contracts, rewarding theft, and encouraging unethical business behavior." *Id.* (quoting *IDS*

42

*Life Ins. Co. v. Sunamerica, Inc.*, 958 F. Supp. 1258, 1282 (N.D. Ill. 1997). Given that Clevinger actively is using OCP's confidential business information to grow CiviClick to the detriment of OCP, and is in direct breach of his of his Noncompete Agreement with OCP, there is no question of continuing and lasting harm in this case. There is a strong public interest in favor of granting this emergency temporary restraining order.

*       *       *

The district court did not analyze three of four preliminary injunction factors. The one it did analyze – whether OCP is likely to suffer irreparable harm – was wrongly decided because it failed to properly account for Clevinger's written stipulation in the Noncompete Agreement and the proffered evidence of irreparable harm. OCP established all four factors.

Accordingly, this Court should reverse the district court's denial of enforcement of the Noncompete Agreement pending the litigation, and remand this case to the district court with an order to enjoin Clevinger, CiviClick, and SCS from any competitive activities or any solicitation of customers or employees through trial in this case.

43

## CONCLUSION

For the foregoing reasons, the district court erred when it denied OCP's motion for a preliminary injunction seeking enforcement of the Noncompete Agreement.  Accordingly, this Court should (1) REVERSE the district court's decision denying a preliminary injunction based on Count I (breach of Noncompete Agreement) of the Amended Complaint; (2) REMAND this case to the district court with instructions to enter a preliminary injunction order: (a) prohibiting Clevinger, CiviClick, and SCS from conducting any further business operations that compete with OCP, (b) prohibiting Clevinger, CiviClick, and SCS from continuing performance of any contracts with any current or former OCP customers, and (c) prohibiting Clevinger, CiviClick, and SCS from soliciting any current or former OCP customers; and (3) ORDER any other relief this Court deems just and proper.

## REQUEST FOR ORAL ARGUMENT

OCP respectfully requests oral argument for this appeal.

Dated: January 29, 2024           Respectfully Submitted,

**ADVOCACY HOLDINGS, INC.**

___/s/_Anand Ramana_____
Anand Ramana (DC Bar No. 489478)

44

VEDDER PRICE, P.C.
1401 New York Ave., N.W.
Suite 500
Washington, D.C. 20005
Tel: (202) 312-3325
E-mail: aramana@vedderprice.com
*Counsel for Appellant Advocacy*
*Holdings, Inc.*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I certify that this brief complies with the type-volume limitation specified in Federal Rule of Appellate Procedure 32(a)(7)(B). According to the word-processing system used to prepare this document, the document contains a total of 8,332 words, excluding those portions of the brief identified in Rule 32(f).

Dated: January 29, 2024      ___/s/_ *Anand Ramana*_____
Anand Ramana (DC Bar No. 489478)
VEDDER PRICE, P.C.
1401 New York Ave., N.W.
Suite 500
Washington, D.C. 20005
Tel: (202) 312-3325
E-mail: aramana@vedderprice.com
*Counsel for Appellant Advocacy*
*Holdings, Inc.*

46

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of January, 2024, I electronically filed the foregoing pleading through this Court's Court Management/Electronic Court Filing system, which then automatically serves it upon the following persons electronically:

Kenneth Chase
CHASE LAW & ASSOCIATES, PA
1141 71st Street
Miami Beach, Florida 33141
Tel: (305) 402-9800
kchase@chaselaw.com
*Counsel for Appellees Chazz Clevinger, CiviClick, Inc., and Superior Campaign Solutions, LLC*

/s/ *Anand Ramana*
Anand Ramana (DC Bar No. 489478)
VEDDER PRICE, P.C.
1401 New York Ave., N.W.
Suite 500
Washington, D.C. 20005
Tel: (202) 312-3325
E-mail: aramana@vedderprice.com
*Counsel for Appellant Advocacy Holdings, Inc.*

47